UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFREY MICHAEL CAYLOR,

Petitioner,

v.

P. COVELLO,

Respondent.

No.  2:22-cv-1896-DJC-CKD P

FINDINGS AND RECOMMENDATIONS

Petitioner Jeffrey Caylor, a state prisoner, proceeds pro se and in forma pauperis with a first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 22.) Petitioner challenges a judgment of conviction in the Sacramento County Superior Court convicting him of murder and other offenses for which he is serving a life sentence. Petitioner challenges the trial court's denial of his motion to replace appointed counsel pursuant to People v. Marsden, 2 Cal.3d 118 (1970). Petitioner also asserts the trial court denied him his Sixth Amendment right of self-representation when it denied his motion under Faretta v. California, 422 U.S. 806 (1975). For the reasons set forth below, the petition should be denied.

**BACKGROUND**

The California Court of Appeal for the Third Appellate District provided the following summary of evidence presented at trial. These facts set forth by the state court of appeal are presumed correct. 28 U.S.C. § 2254(e)(1).

1

[Jeffrey] Caylor and [Kari Ann] Hamilton were boyfriend and girlfriend and lived together along with Hamilton's teenage son. Caylor and Hamilton ran a smoke shop together. [Vineet] Parnami was their landlord and ran a convenience store in the same strip mall. Caylor and Hamilton were both abusive toward Parnami, yelling at him, disparaging him, and telling him to get out of their country. Caylor and Hamilton each had such run-ins with Parnami about 20 to 30 times. Caylor told Parnami that Caylor had killed people and would come after Parnami and his family if Parnami did not do what he wanted him to do. In November 2012, Parnami found footage from his security camera showing Hamilton giving a handgun to Caylor as they left the smoke shop. Parnami evicted Hamilton and Caylor in December 2013 for failure to pay rent.

On March 16, 2014, Caylor, Hamilton, and Hamilton's son went to Home Depot in Sacramento. Hamilton and her son went inside, while Caylor stayed outside in a green Buick owned by Hamilton's mother. Also at Home Depot were [Hassan] Alawsi and his sister. Alawsi's sister was wearing a flowing blouse, with black pants and a black head scarf. After Hamilton and her son came back out to the green Buick and got into the car with Hamilton in the front passenger seat, Caylor drove next to the car where Alawsi was shutting the trunk. Caylor said something in an angry tone to Alawsi, pointed Hamilton's handgun at Alawsi, and shot him. Alawsi died as a result of the shooting.

Later the same evening, Caylor and Hamilton went to the home of [Lillian] Thury-Taylor, who was sitting outside her residence in a car she had rented, a white Toyota. First Caylor and then Hamilton approached Thury-Taylor, telling her that she needed to go inside because there was danger. When Thury-Taylor went inside, Caylor followed her into the house and pointed a handgun at her. He told her he wanted her car. He pistolwhipped and choked her, and he left. Thury-Taylor found that the key to the white Toyota was gone. Later, after returning home from getting treatment, Thury-Taylor discovered that the white Toyota had been taken.

The next morning, on March 17, 2014, Caylor drove to Parnami's business in the white Toyota, with Hamilton and her son as passengers. Hamilton was in the front passenger seat. Parnami was outside the store. He had not seen Caylor and Hamilton since he evicted them in December 2013. Caylor drove within five feet of Parnami, pulled Hamilton's handgun from between the seats, pointed it at Parnami, and pulled the trigger three times. Parnami heard three clicks, but the gun did not fire. Caylor said something like "You're lucky I haven't killed you," or "You're lucky it didn't go," or "You're lucky I still like you," or "You're lucky," and drove away. As he was driving away, Caylor said, "I almost got him."

Caylor, Hamilton, and Hamilton's son headed north for Idaho in the white Toyota, stopping to buy more ammunition. They were detained in Chico later that day. A search of the white Toyota revealed Hamilton's handgun and the package of ammunition, unopened. A live round was chambered, and additional rounds were in a magazine.

2

> A firearms expert testified that he test-fired Hamilton's handgun three times using ammunition he had in the lab, and the handgun fired each time.  He also testified that, if there was a problem with the ammunition, it was possible the handgun would not fire when the trigger was pulled even though the handgun was in working condition.  Tests of the handgun showed that it did not make a clicking sound when the trigger was pulled with the safety on but made a loud clicking noise when the safety was off. . .
>
> A jury convicted Caylor of: (1) first degree murder of Alawsi (§ 187, subd. (a)) with a special circumstance of discharging a weapon from a vehicle (§ 190.2, subd. (a)(21)) and a finding that Caylor discharged a weapon causing death (§ 12022.53, subd. (d)); (2) possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)); (3) first degree robbery of Thury-Taylor (§ 211) with a finding that he personally used a firearm (§ 12022.53, subd. (b)); (4) first degree burglary of Thury-Taylor (§ 459) with a finding that he personally used a firearm (§ 12022.53, subd. (b)); (5) assault on Thury-Taylor (§ 245, subd. (a)(2)) with findings that he personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)); (6) vehicle theft (§ 10851, subd. (a)); and (7) attempted murder of Parnami (§§ 664/187, subd. (a)) with a finding that he personally used a firearm (§ 12022.5, subd. (a)(1)).

People v. Caylor, No. C084183, 2021 WL 2007025, at *3 (Cal. Ct. App. May 20, 2021).

The trial court sentenced petitioner to life without possibility of parole, plus additional terms. People v. Caylor, 2021 WL 2007025, at *1. Petitioner timely appealed and the California Court of Appeal for the Third Appellate District affirmed the judgment as to petitioner. Id. at *15. The California Supreme Court denied review. (ECF Nos. 13-1, 13-2.)

Petitioner initiated the present federal action on October 19, 2022.[1] (ECF No. 1.) By order filed on September 6, 2023, the court determined the petition contained both exhausted and unexhausted grounds for relief and granted petitioner a stay of the case pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), for the purpose of exhausting state court remedies on grounds three and four in the petition. (ECF Nos. 19, 20.) Petitioner then filed the first amended petition on which he now proceeds, omitting the unexhausted grounds for relief. (ECF No. 22.) After petitioner failed to file any status reports as the court had ordered, the stay of this case was lifted on May 8, 2024. (ECF No. 24.) Respondent has answered the first amended petition. (ECF No. 30.)

---

[1] The court applies the prison mailbox rule. See Houston v. Lack, 487 U.S. 266 (1988).

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

4

disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

## ANALYSIS

The first amended petition incorporates arguments made to the California Supreme Court seeking discretionary review. (<u>See</u> ECF No. 22 at 5, 7.) Petitioner challenges (1) the trial court's August 31, 2016, denial of his motion to replace appointed counsel, Mr. Smith (ECF No. 1 at 5, 32-51), and (2) the trial court's November 8, 2016, denial of his motion to represent himself (<u>see</u> ECF No. 1 at 7, 52-54). In the last reasoned state court opinion addressing these claims, the California Court of appeal summarized and recounted the lengthy procedural history relevant to these claims as follows:

> On August 8, 2014, after Caylor's arraignment, the trial court appointed attorney Peter Kmeto to represent him.
>
> On October 23, 2014, Caylor filed a Faretta motion. Judge Michael Savage granted the motion on October 28, 2014.
>
> On December 23, 2014, Caylor filed a motion to have "assistant counsel" appointed and to replace his investigator. In his motion, Caylor wrote "that if this is the type of 'Evenhanded' Justice [the trial court] speaks of in court, then we are truly in for a long haul of discoverable violations committed within this Sacramento County Judicial System and ranks." Judge Jaime Román denied the motions, observing that Caylor appeared to focus on "sidetracking" the case.
>
> On April 7, 2015, Caylor filed a motion for advisory counsel, characterizing the motion as his third attempt to have advisory counsel appointed. In the motion, Caylor wrote: "If[ ] nothing else [Caylor] prays this court will recognize his persistence in the matter and acknowledge he will be back a fourth, fifth or however many attempts it will take to secure the sought request." Judge Román denied the motion; however, after Caylor filed a renewed motion, the trial court appointed attorney Jessica Graves as advisory counsel "to answer legal questions relating to the [ ] matter and not to assist him

in preparing or presenting submissions or attending any court appearances." (Fn. omitted.)

On May 20, 2015, Judge Román issued an order to show cause why the appointment of advisory counsel should be revoked because, "despite the limitation of the order, [Caylor's] expectation for services exceeds the parameters of [counsel's] appointment." However, on May 27, 2015, Judge Román deferred action on the order to show cause.

On June 24, 2015, Caylor filed a motion to substitute new advisory counsel in place of attorney Graves, alleging she failed to contact him. It does not appear the trial court ruled on this motion.

On July 8, 2015, Caylor withdrew his request to represent himself. Judge Allen Sumner ordered that counsel be appointed. Attorney Laurence Smith was appointed.

On July 14, 2015, Caylor made another Faretta motion. Judge Román ruled: "[I]t appears that [Caylor] either does not know what he wants or ... is 'gaming.' Neither approach compels salutary relief. [Caylor's] oral Faretta motion of July 14, 2014 is accordingly denied." Also on July 14, 2015, attorney Smith expressed a doubt about Caylor's competence to stand trial. Judge Román suspended criminal proceedings and initiated section 1369 proceedings.

On July 24, 2015, Caylor submitted ex parte documents seeking emergency relief to invoke his Faretta rights. Judge Román summarily denied the request.

On September 17, 2015, Judge Román reinstated criminal proceedings.

Caylor refused to appear for proceedings on September 9 and 17, 2015, so Judge Román issued a cell-extraction order for Caylor to appear on September 23, 2015.

On September 23, 2015, Caylor made another oral Faretta motion. Judge Román denied the motion.

On September 25, 2015, Caylor filed a written Marsden motion seeking to replace attorney Smith or, in the alternative, to represent himself.

On December 17, 2015, Caylor refused to appear. Judge Román denied the Marsden motion without prejudice. Judge Román also issued another extraction order.

On January 22, 2016, Caylor again moved to replace attorney Smith or, in the alternative, to represent himself. And, on February 19, 2016, Judge Michael Bowman granted Caylor's request to represent himself and appointed attorney Jennifer Mouzis as advisory counsel.

On August 9, 2016, Caylor was present in court representing himself for the first day of trial, with Judge Michael Kenny presiding.

6

On August 11, 2016, defendant refused to appear.

On August 15, 2106, Caylor appeared for trial. He said that he had refused to appear on August 11 because advisory counsel had not visited him. He also complained that the pro. per. coordinator and investigator were not cooperating. Finally, Caylor asked for appointment of counsel. Judge Kenny noted that defendant had counsel before, as well as advisory counsel, and had refused to come to court as a way of trying to accomplish his objectives. Judge Kenny denied the request for appointment of counsel as untimely. Judge Kenny also informed Caylor that, if he refused to come to court, it would be treated as a voluntary absence and that trial would proceed. Later, during the proceedings of the day, Caylor reiterated that he wanted counsel. When he did not get his way, Caylor began yelling and using profanity, and said, apparently referring to the court and others involved in the pro. per. services, "You are all going to pay for this shit."

On August 16, 2016, Caylor voluntarily appeared in jail clothing.

On August 17, 2016, before jury selection started, defendant objected when told he could not stand during jury selection. He added: "And I need an attorney. I need to get that on the record." Judge Kenny told Caylor he could not tell the jury he had requested counsel, and Judge Kenny rejected his request. Judge Kenny said: "[Y]our self-representation status is not an issue for the jury. You decided to go pro per, you have removed two attorneys.... [T]his past Monday you elected to change your mind. At that point in time the Court denied the request. [¶] The Court would also note that, in fact, I originally gave you a continuance at your request when you first had this case assigned to this Court. The Court would also note that you refused to come to court last week. So when you look at all those things, the Court did not believe that, in fact, you were playing it straight." Judge Kenny reminded Caylor that his request for counsel was denied because it was untimely. Still later the same day, Caylor asked a prospective juror whether the juror would "feel differently if I needed help in this case but couldn't get it?" Judge Kenny sustained the prosecutor's objection to the question.

On August 18, 2016, Caylor again said in front of the jury panel that he needed counsel. Judge Kenny excused the prospective jurors and discussed with Caylor the fact that he could not raise the issue of assistance of counsel with the jury. During the discussion, Caylor repeatedly said he needed counsel and added: "I need counsel. And, again, I say that, I need counsel. And I will say that every time we bring a jury in here until we get counsel for me. I need counsel." Judge Kenny summarized Caylor's past requests and concluded: "And what this Court sees, Mr. Caylor, is a continual pattern in which you go back and forth as a way of apparently attempting to delay the proceedings." Caylor stated again that he needed counsel and would tell the jury so "every time." Caylor said he would accept any counsel except attorney Smith, who he believed had a conflict because attorney Smith had a client who attempted to be a "snitch" in this case. Caylor added that he would file a <u>Marsden</u> motion if attorney Smith were reappointed and that he had made a complaint to the State

Bar about attorney Smith.

Still on August 18, 2016, the prosecutor and Judge Kenny agreed the jury panel had been tainted by Caylor's statements about needing counsel to the extent that the parties would not be afforded a fair trial. Judge Kenny told Caylor that, if Judge Kenny referred Caylor to the panel for appointment of counsel, it was possible attorney Smith would be reappointed because he was the most familiar with the case. Judge Kenny also told Caylor that attorney Smith did not necessarily have a conflict of interest just because Caylor believed one existed. Concerning the possibility that attorney Smith would be reappointed, Judge Kenny warned Caylor that, if Caylor filed another Faretta motion to avoid being represented by attorney Smith, Judge Kenny would consider it an attempt to "manipulate the system." With that, Judge Kenny declared a mistrial and referred the matter to the panel to send an attorney to represent Caylor.

On August 22, 2016, the criminal conflict panel accepted the case, and on August 29, 2016, attorney Smith was reappointed as Caylor's counsel. Judge Kenny set trial for November 7, 2016.

Also on August 29, 2016, Caylor filed a Marsden motion, seeking replacement of attorney Smith. [….]

Judge Kenny heard the Marsden motion on August 31, 2016 [and denied the motion.] [….]

On November 2, 2016, Caylor again filed Marsden and Faretta motions. Caylor alleged attorney Smith had failed to meet with him to prepare for trial and that attorney Smith did not intend to fight for Caylor but was instead "incahoots" (sic) with the prosecutor. He claimed he was not seeking continuance of the trial, which was still scheduled for November 7, 2016, and that he was willing to be shackled if he did not control his emotions. Finally, he offered his "sacred pinky swear" that he would behave himself.

Judge Kenny held a closed hearing on Caylor's Marsden motion on November 8, 2016 [and denied the motion.] [….]

Judge Kenny then considered the Faretta motion in open court and denied it.

People v. Caylor, 2021 WL 2007025, at *3-7.

### I.      Denial of *Marsden* Motion on August 31, 2016

Petitioner argues the record reflected an irreconcilable conflict with his attorney, Mr. Smith. (ECF No. 1 at 26, 51.) He asserts the trial court failed to make sufficient inquiry of defense counsel before denying the Marsden motion on August 31, 2016. (Id.)

To the extent petitioner asserts the trial court violated state law in denying his Marsden motion, the claim is not cognizable in this proceeding. See Corcoran, 562 U.S. at 5; McGuire, 502

U.S. at 67-68. The court's "*only* concern when reviewing the constitutionality of a state-court conviction is whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (quoting 28 U.S.C.A. § 2254(a)). Thus, the court construes the allegations as raising a Sixth Amendment claim and finds petitioner is not entitled to relief.

"The Sixth Amendment guarantees criminal defendants the right to effective representation, but indigent defendants do not have a constitutional right to be represented by their counsel of choice." Gonzalez v. Knowles, 515 F.3d 1006, 1012 (9th Cir. 2008) (citing Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989)); see also United States v. Gonzalez-Lopez, 548 U.S. 140, 151 (2006) ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."). "However, forcing a defendant to go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel." Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007), cert. denied, 555 U.S. 908 (2008); see also Schell, 218 F.3d at 1025.

To determine whether a conflict rises to the level of "irreconcilable," courts in the Ninth Circuit consider the following factors: (1) the extent of the conflict; (2) the adequacy of the inquiry by the trial court; and (3) the timeliness of the motion for substitution of counsel. Clark v. Broomfield, 83 F.4th 1141, 1155 (9th Cir. 2023). The Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel. Morris v. Slappy, 461 U.S. 1, 13-14 (1983).

Petitioner's written Marsden motion preceding the August 31, 2016, hearing stated the following:

> [1] [Mr. Smith] did represent a Jailhouse Snitch Sophia Roses at the time Ms. Roses contacted Deputy District Attorney Donnell Slivka to provide 'Some Information' In [petitioner's case] on July 25th and Aug 6th 2014," and [2] [Mr. Smith] did state in a letter on Sept. 9th 2015 that this defendant 'became very angry and said things that were clearly threats against my life' (his life).

(ECF No. 25-9 at 204.) Petitioner attached a letter from Mr. Smith addressing statements that were "threats against my life" and cautioning petitioner about making threats. (ECF No. 1 at 206-

07.) Petitioner also attached a memorandum from the prosecutor stating Ms. Roses had contacted her but that the prosecutor "will not be contacting Ms. Roses to take a statement from her[.]" (Id. at 209.)

During the Marsden hearing on August 31, 2016, the court asked plaintiff to explain the grounds for his written Marsden motion and plaintiff did so. (ECF No 32 at 30-44.) Petitioner expressed concern that Mr. Smith had not relayed that his client, Ms. Roses, had contacted the prosecutor about petitioner's case and stated there may have been content that should have been turned over to him. (Id. at 35-36.) Petitioner also stated he "disagree[d]" that he had made any threats against Mr. Smith's life but expressed distrust because "if [Mr. Smith] feels that way, how can I feel he is fighting for my life[?]" (Id. at 35.) Petitioner stated he did not feel he could trust Mr. Smith. (Id.) Petitioner also claimed he and Mr. Smith could not communicate. (Id. at 39.)

Regarding communication, the trial court noted Mr. Smith had been on the case for "a total of two days." (ECF No. 32 at 37.) The trial court made inquiry regarding petitioner's concerns. (Id. at 34-41.)

Regarding the allegations about Ms. Roses, Mr. Smith stated Ms. Roses was very interested in being an informant against individuals, that the prosecutor was aware of this tendency and believed Ms. Roses was untrustworthy, and that Ms. Roses never gave Mr. Smith any information concerning petitioner or petitioner's case. (ECF No. 32 at 33-34.) The court also invited the prosecutor to enter the courtroom for a portion of the closed hearing and asked the prosecutor about her conversation with Ms. Roses. (Id. at 40.) The prosecutor stated she told Ms. Roses she could not talk to her and confirmed she did not get any information from her. (Id. at 40-41.)

Mr. Smith also addressed the issue of alleged threats. According to Mr. Smith, petitioner "was not happy" when Mr. Smith informed him something petitioner had proposed to do did not have legal merit. (ECF No. 32 at 36.) And further, "at one time his… response was to tell me that, um, if I didn't do what he wanted me too that I was going to be a, quote, dead mother fucker, end quote." (Id.) Mr. Smith stated he thought the threats were "some melodrama" probably carried out for the purpose of manipulating him into declaring a conflict and that he did not intend to be

10

manipulated in that way. (Id. at 36-37.) Mr. Smith stated he had been "prevailed upon… to take the case" because no one else could be found. (Id.) Mr. Smith stated he was not concerned, did not fear for his life, and had no problem doing the best job he could for petitioner with the evidence in the case. (Id.)

The record shows the trial court made an "appropriate inquiry" into the grounds for petitioner's Marsden motion on August 31, 2016, before resolving it on the merits. Schell, 218 F.3d at 1025. Thus, the state appellate court reasonably rejected petitioner's argument that the trial court failed to make sufficient inquiry of Mr. Smith.

The record also reflects the state appellate court reasonably determined there was no irreconcilable conflict between Mr. Smith and petitioner that required substitution of counsel. The "ultimate constitutional question" on federal habeas review is whether the trial court's rejection of petitioner's Marsden motion actually violated his constitutional rights "in that the conflict… had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026. "'An irreconcilable conflict' claim has been recognized 'only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel.'" Clark, 83 F.4th at 1155 (quoting Stenson, 504 F.3d at 886).

The state appellate court reasonably found "the record is sufficient to show both preparation and communication, even if it was not in the way Caylor preferred." People v. Caylor, 2021 WL 2007025, at *7. And further, "the trial court was justified in concluding that Caylor was merely trying to disrupt the proceedings for delay or whatever benefit he believed he could derive from the disruption.[2] A defendant cannot force substitution of counsel by his own misconduct." (Id. at 8.)

////

---

[2] Explaining the denial of the Marsden motion, the trial court told petitioner "I'm not going to let you essentially run through attorneys by making ostensible or non ostensible threats to the attorneys until you get someone who you are comfortable with." (ECF No. 32 at 39.)

11

Finally, petitioner's concern regarding the alleged threat he denied making against Mr. Smith did not demonstrate an irreconcilable conflict. Denial of substitute counsel because a defendant "dislike[s] or distrust[s]" counsel does not violate the Sixth Amendment. See Michaels v. Davis, 51 F.4th 904, 939 (9th Cir. 2022) (per curiam) (a "defendant is not entitled to substitute counsel because of a conflict of his 'own making,' or because he refuses to cooperate with counsel 'because of dislike or distrust' of counsel"). Petitioner has not shown that he was entitled to substitute counsel under clearly established federal law, and his Sixth Amendment claim fails.

**II.      Denial of <u>Faretta</u> motion on November 8, 2016**

Petitioner also challenges the denial of his Faretta motion. (ECF No. 1 at 26-27, 53.) He argues the trial court erred because there was reasonable justification for its timing. (Id.)

"[T]he Sixth and Fourteenth Amendments include a 'constitutional right to proceed without counsel when' a criminal defendant 'voluntarily and intelligently elects to do so.'" Indiana v. Edwards, 554 U.S. 164, 170 (2008) (quoting Faretta, 422 U.S. at 807). A Faretta request should generally be granted if it is timely, not for purposes of delay, unequivocal, voluntary, and intelligent. United States v. Maness, 566 F.3d 894, 896 (9th Cir. 2009). However, the right to self-representation is "not absolute." Martinez v. Ct. of Appeal of California, Fourth App. Dist., 528 U.S. 152, 153 (2000) (quoting Faretta, 422 U.S. at 835). The Supreme Court has observed "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." Martinez, 528 U.S. at 162.

Here, petitioner made the Faretta motion at issue on November 8, 2016, which was "the day… scheduled for jury selection[.]" (ECF No. 25-19 at 179.) Petitioner indicated he was "ready to roll" with "[n]o continuance." (Id.) The prosecutor objected to this "third Faretta motion[,]" noting petitioner's previous conduct when attempting to represent himself had resulted in dismissal of a jury panel after two and half days of jury selection after which petitioner had indicated he would disrupt proceedings until counsel was appointed. (Id. at 179-180.)

The trial court stated petitioner's filing of multiple Marsden and Faretta motions seemed "designed to be disruptive" and that it seemed like petitioner was trying to manipulate the system. (ECF No. 25-19 at 183-84.) The trial court invited petitioner's response, and petitioner promised

12

there would be no more disruptions. (Id. at 184.) The trial court denied the motion, finding it was "offered at the last minute" and "made for purposes of disruption to these proceedings." (Id.)

The state appellate court rejected petitioner's Faretta claim, finding the record amply supported the trial court's decision that petitioner's prior conduct precluded him from again exercising his right to self-representation. People v. Caylor, 2021 WL 2007025, at *8. The state appellate court reasoned

> Caylor was not credible and could not be trusted to follow through on his promise that he was ready for trial and would not be disruptive. A reading of the procedure leading up to the denial of the Faretta motion on November 8, 2016, makes it apparent to any reasonable person that Caylor would continue to commit misconduct prejudicial to the administration of justice.

People v. Caylor, 2021 WL 2007025, at *8.

Petitioner's written request was made six days before trial, on November 2, 2016. (See ECF No. 25-9 at 230.) Faretta "does not define when such a request would become untimely." Marshall v. Taylor, 395 F.3d 1058, 1061 (9th Cir. 2005). State courts may, consistent with Faretta, decide that a self-representation request made less than "weeks before trial" is untimely. See id. To the extent the trial court denied the Faretta motion as untimely, that decision was objectively reasonable and not contrary to or an unreasonable application of clearly established federal law.

In addition, the trial court reasonably concluded that petitioner brought the motion for purposes of disruption. Under Faretta, the "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Faretta, 422 U.S. at 834 n.46, citing Illinois v. Allen, 397 U.S. 337, 347 (1970). "The right of self-representation is not a license to abuse the dignity of the courtroom." Faretta, 422 U.S. at 834 n.46.

By the time the trial court denied petitioner's request to return to self-representation on November 8, 2016, the trial court had observed petitioner's pre-trial conduct which included a period of self-representation. The trial court reasonably concluded petitioner would disrupt proceedings, consistent with past behavior, despite promising otherwise. See United States v. Flewitt, 874 F.2d 669, 674 (9th Cir. 1989) (a defendant's pretrial activity is relevant if it affords a

13

strong indication that defendant will disrupt courtroom proceedings). Petitioner has neither shown that any factual findings were unreasonable in light of the state record, 28 U.S.C. § 2254(d)(2), nor that denial of his motion to return to self-representation was contrary to or an unreasonable application of Faretta, 28 U.S.C. § 2254(d)(1).

**CONCLUSION**

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or that it resulted in a decision based on an unreasonable determination of the facts.

Accordingly, it is RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In any objections, petitioner may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any reply to objections shall be served on all parties and filed with the court within seven (7) days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 9, 2026

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8, cayl1896.fr

14